IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-HC-2114-D

| | | |
|---|---|---|
| TRAVIS BERNARD THOMAS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JOSEPH B. HALL, Admin., | ) | |
| Johnston Correctional Institution, | ) | |
| | ) | |
| Respondent. | ) | |

Travis Bernard Thomas ("Thomas" or "petitioner"), a state inmate, filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 [D.E. 1]. On July 27, 2010, respondent answered the petition [D.E. 7] and filed a motion for summary judgment [D.E. 8]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Thomas about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 10]. On August 3, 2010, Thomas filed a response in opposition to the motion [D.E. 11] and a motion entitled "writ of mandamus" [D.E. 12]. As explained below, respondent's motion for summary judgment is granted and petitioner's motion is denied.

I.

The North Carolina Court of Appeals summarized the facts of this case as follows:

> From 2000 to 2006, defendant was romantically involved with "Jane" while both lived in Wilson, North Carolina. In April or May 2006, the two ended their romantic relationship, and defendant moved to Georgia. According to Jane, she broke up with defendant because of his tendency to "date other women" and her realization that she "could do better." Between April 2006 and 20 November 2006, Jane spoke with defendant five or six times on the phone. Jane reported that the communication "wasn't hostile, but it wasn't pleasant either."

In November 2006, defendant made a visit to North Carolina to see his mother. In early November, defendant and Jane had dinner, but Jane did not want to see him again although defendant made frequent phone calls to her while he was still in North Carolina. On 20 November 2006, defendant called Jane on her cell phone and told her that he had something "really important" to show her before he returned to Atlanta. When Jane told him that she was on her way home with her son and nephew, he told her that he would meet her at her house.

Defendant arrived a little after 9:00 p.m. Jane agreed to accompany him to see what he wanted to show her, but only if she could bring the two boys with her because they had not spent any time together that day. She expected to return home within 20 to 30 minutes and left wearing her bedroom slippers.

Jane followed defendant's car in her own. She noticed that defendant was driving further and further into the countryside. Because she was becoming concerned about the distance, she used her cell phone to call defendant's cell phone and ask where they were going. She got his voice mail, but he called her back and told her that they were "almost here" and immediately turned into an abandoned area with an older house and several barns. Defendant told Jane that the farm had belonged to his grandmother, that he had grown up on it, and that he had recently purchased it.

Defendant then convinced Jane to get into his car where they talked for a while. Defendant told Jane, "I just want to know what we are." She replied, "We are friends. If the Lord decides to do something different, you know, intervene and [to] change things, then fine. But, right now, I think it's best for us just to be friends." He responded, "See. That's all I wanted. I just wanted you to be honest with me." Defendant then told her that he had "got something" for her "in case [they did not] see [each other] again."

Defendant went to his trunk and retrieved an object wrapped in a blue blanket. After he got back into the car, he told Jane, "Turn your head to the left side and count to 20." She replied, "What? You done lost your mind." He urged her, saying "I'm going to surprise you. I'm going to surprise you." Jane testified that she heard something click and asked defendant if he had a gun inside the blanket. He denied it, saying that he was afraid of guns. After she heard another click, Jane grabbed the blanket and felt the barrel of a gun.

At that point, Jane tried to escape from the car, but defendant sprayed her with mace and drove off, leaving the two boys alone in Jane's car. The boys saw that defendant had driven off while Jane was trying to get out of the car — her feet were initially being dragged along the road. Jane's son called his father, Dwight Joyner. Joyner set out to find the boys and called 911 twice to summon the police.

Jane asked defendant what he was doing, and he responded: "Shut the fuck up. Shut up. Shut up. I'm so damn tired of you. Now, I'm in control. I'm in damn

2

control now. Shut the fuck up." Jane begged defendant not to kill her. He replied, "Shut up . . . [Jane], you jump out of the car, I got my hand on the trigger. I will kill you." She pled with him some more, asking him to think of her son, her nephew, defendant's daughters, and their pastor.

Jane then jumped out of defendant's car while it was still moving. She suffered a number of injuries to her head, foot, knees[,] stomach, and arms from hitting the road. Defendant stopped the car, put a rifle to her head, and threatened, "If you holler, I'll kill you." He then dragged her back to the car, scraping her stomach raw, and put her back inside. He drove to a secluded, wooded area and told her to pull her pants down. She said that she could not move, so he removed her pants and got on top of her. He then had sexual intercourse with her. Jane was unable to push him off because her arm was injured.

After defendant finished, he said, "Man, see. It wasn't supposed to go down like this, man. It wasn't supposed to go down like this." Jane asked him to take her back to the boys so that they could go to the emergency room, and she promised not to tell anybody about the rape. Defendant explained that the road they were on was a loop and started driving again. As they went around the loop, she saw flashing lights and realized that the boys had turned on the hazard lights and that she was near her car. She again jumped out of defendant's car and ran to her own. Defendant then drove off.

Jane tried to drive back to her house, but had trouble seeing because the mace was still burning her eyes. As Jane was trying to drive home, they encountered Joyner, her son's father. The police and emergency medical technicians met Jane at her house and took her to the emergency room. Jane reported that defendant had raped her. Officers could smell the odor of mace on Jane. When inspecting the crime scene, officers found Jane's bedroom slippers in the middle of the road.

The next day, defendant contacted the Sheriff's Department in Wilson County to ask whether there were any warrants for his arrest. He told Detective Williams that he had raped someone, "but it wasn't like that." He ultimately gave a voluntary statement to the Greene County Sheriff's Department that same day in which he admitted many of the events described by Jane, but claimed that they had consensual sex. Defendant acknowledged, however, that Jane had injured herself when jumping out of his car and that he had asked if she wanted to go to the emergency room.

The SBI seized defendant's car and collected a .22 rifle, an empty .22 ammunition box, duct tape, handcuffs, binoculars, and handwritten letters. In one letter, defendant wrote: "You have done played with my feelings long enough. Now it's time for payback." Defendant also wrote: "I have taken enough shit from you, and this is the last straw. I know people will be shocked and hurt, but I can't take someone playing games with me and my feelings." He ended by saying that he was "[s]orry" to his parents, siblings, Jane's mother, Jane's son, and Jane's nephew.

3

> Defendant was indicted for first degree kidnapping and first degree rape. At trial, defendant testified on his own behalf, asserting that the sexual intercourse was consensual. He admitted that he removed a rifle from his trunk, wrapped it in a blue blanket, and moved it to the back seat, but claimed that he never displayed it to Jane. He testified that his can of pepper spray "went off by accident." On cross-examination, the prosecutor asked, "So how did you get consensual sex out of somebody who had a broken arm, a stomach that was ripped up, a knee that had injuries on it, feet that had injuries . . . ?" Defendant explained that he only knew that Jane's arm was hurting and that her eyes were watering from the mace; he learned about her other injuries later. He explained: "There was never no pushing, no, 'Get off me,' screaming. It's the same way we've been having sex. The difference is at that particular night her arm was hurting." He added: "She didn't say no."
>
> The jury convicted him of first degree kidnapping and first degree rape. The trial court sentenced defendant to a presumptive-range sentence of 216 to 269 months for the first degree rape conviction. The trial court arrested judgment on the first degree kidnapping charge and sentenced defendant for second degree kidnapping to a consecutive presumptive-range sentence of 24 to 38 months.

State v. Thomas, 196 N.C. App. 523, 524–27, 676 S.E.2d 56, 57–59 (2009) (footnote omitted). The North Carolina Court of Appeals, finding no error, affirmed Thomas's conviction and sentence. Id. at 535, 676 S.E.2d at 64. Thomas did not seek discretionary review in the North Carolina Supreme Court. Pet. ¶ 9.

On May 5, 2010, Thomas signed his section 2254 petition. Pet. 15. Thomas asserts that he received ineffective assistance of trial counsel because "trial counsel failed to argue petitioner's first offender status during sentencing." Pet. ¶ 12. Thomas did not raise this claim on direct appeal or in any state postconviction proceeding. Id.; see Thomas, 196 N.C. App. at 524, 533, 676 S.E.2d at 57, 62 (describing Thomas's two claims on direct appeal).

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party

seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A federal court cannot grant habeas relief in cases where a state court considered a claim on its merits unless (1) the state-court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or (2) the state-court decision was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d). A state-court decision is "contrary to" Supreme Court precedent if it either "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to the Supreme Court's. Williams v. Taylor, 529 U.S. 362, 405 (2000). A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." See id. at 407; Renico v. Lett, 130 S. Ct. 1855, 1862 (2010).

[Section 2254(d)] does not require that a state court cite to federal law in order for

5

a federal court to determine whether the state court decision is an objectively reasonable one, nor does it require a federal habeas court to offer an independent opinion as to whether it believes, based upon its own reading of the controlling Supreme Court precedents, that the [petitioner's] constitutional rights were violated during the state court proceedings.

Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc). Moreover, a state court's factual determination is presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Sharpe v. Bell, 593 F.3d 372, 378 (4th Cir. 2010).

Respondent contends summary judgment is appropriate for two reasons. First, the claim is procedurally barred because Thomas failed to raise it on direct appeal. Second, the claim lacks merit. Mem. Supp. Mot. Summ. J. 7–11. While "the procedural-bar issue ... ordinarily should be" resolved first, "[j]udicial economy" permits the district court to exercise its discretion and address claims on the merits when they are "easily resolvable against the habeas petitioner." Lambrix v. Singletary, 520 U.S. 518, 525 (1997). Because Thomas's claim clearly lacks merit, the court addresses respondent's motion for summary judgment on that ground.

Thomas claims his "trial counsel failed to argue petitioner's first offender status during" his sentencing hearing. Pet. ¶ 12. In response to the motion for summary judgment, Thomas contends that as "a first offender [he is] ... clearly entitled to a mitigated sentence." Mot. Mandamus 2.

The Sixth Amendment right to counsel includes the right to the effective assistance of counsel at both the trial and appellate levels. See, e.g., Bobby v. Van Hook, 130 S. Ct. 13, 16 (2009) (per curiam); Strickland v. Washington, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel at the trial level, a habeas petitioner must establish two things. First, a petitioner must show that the counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time. See, e.g., Van Hook, 130 S. Ct. at 16; Strickland, 466 U.S. at 687–91. In reviewing this element, a reviewing court must be "highly

6

deferential" of counsel's performance and must make every effort to "eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. Therefore, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.; Gray v. Branker, 529 F.3d 220, 228–29 (4th Cir. 2008). Second, a petitioner must show there is a "reasonable probability" that, but for the deficiency, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. A petitioner bears the burden of proving both deficient performance and prejudice. Id. at 687.

Here, Thomas cannot meet his burden on either prong. At sentencing, Thomas did not say anything on his own behalf. Tr. at 574–75. His attorney

> *request[ed] the Court to – any sentence he imposes to be in the mitigated range.*
>
> THE COURT: Okay. Defendant having been convicted by a jury of the class B1 felony of first-degree rape, class B1, *the Court finds the Defendant has no prior record.* The Court has considered facts in mitigation. However, the Court feels based upon this – the severity of this offense the Court's going to sentence in the presumptive range.

Id. at 575 (emphases added). Thus, Thomas's counsel requested a mitigated sentence, the trial court was aware of and considered petitioner's lack of criminal history, and chose within its discretion to impose a sentence in the presumptive range. See, e.g., State v. Mack, 161 N.C. App. 595, 606, 589 S.E.2d 168, 176 (2003) (trial court properly imposed sentence within presumtive statutory range, even though there was evidence supporting mitigating factors). Counsel did not perform deficiently. Thus, the claim fails. See, e.g., Harrington v. Richter, 131 S. Ct. 770, 786–92 (2011); Premo v. Moore, 131 S. Ct. 733, 742–46 (2011).

III.

In sum, the court GRANTS respondent's motion for summary judgment [D.E. 8] and DISMISSES Thomas's application for a writ of habeas corpus [D.E. 1]. The court DENIES AS

7

MOOT petitioner's motion entitled "writ of mandamus" [D.E. 12]. The court also DENIES a certificate of appealability. See 28 U.S.C. § 2253(c). The Clerk of Court shall close this case.

SO ORDERED. This 14 day of March 2011.

*James Dever*
JAMES C. DEVER III
United States District Judge